

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **UNDER SEAL** |
| | ) | |
| Plaintiff, | ) | Criminal No. 1:20-CR- 103 |
| | ) | |
| v. | ) | Count 1: Conspiracy to Participate in a |
| | ) | Racketeering Enterprise (18 U.S.C. |
| ARMANDO ELIU MELGAR DIAZ, | ) | § 1962(d)) |
| a.k.a. "Blue," | ) | |
| a.k.a. "Clipper," | ) | Count 2: Conspiracy to Provide and |
| | ) | Conceal Material Support to Terrorists |
| Defendant. | ) | (18 U.S.C. § 2339A(a)) |
| | ) | |
| | ) | Count 3: Conspiracy to Kill or Maim |
| | ) | Persons Outside the United States (18 |
| | ) | U.S.C. § 956(a)(1)) |
| | ) | |
| | ) | Count 4: Conspiracy to Commit Acts |
| | ) | of Terrorism Transcending National |
| | ) | Boundaries (18 U.S.C. §§ 2332b(a)(1), |
| | ) | 2332b(a)(2), and 2332b(c)) |
| | ) | |
| | ) | Count 5: Conspiracy to Finance |
| | ) | Terrorism (18 U.S.C. § 2339C(a)) |
| | ) | |
| | ) | Count 6: Narco-Terrorism Conspiracy |
| | ) | (21 U.S.C. § 960a(a)) |
| | ) | |
| | ) | Count 7: Conspiracy to Violate IEEPA |
| | ) | (50 U.S.C. § 1705(a) and 31 C.F.R. |
| | ) | § 590.201) |
| | ) | |
| | ) | Count 8:  Conspiracy to Distribute |
| | ) | Controlled Substances (21 U.S.C. |
| | ) | §§ 841(a)(1) and 846 |

**INDICTMENT**

THE GRAND JURY CHARGES THAT:

GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise stated:

The Defendant

1.     The defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," was a member of La Mara Salvatrucha, also known as "MS-13."

2.     In 2003, MELGAR DIAZ traveled from El Salvador to the United States, settling in the Eastern District of Virginia.  After moving to Virginia, MELGAR DIAZ joined the Gangsters Locos Salvatruchas ("GLS") clique of MS-13.

3.     In approximately February 2013, MELGAR DIAZ was deported from the United States to El Salvador.

4.     In approximately August 2013, MELGAR DIAZ re-entered the United States.  In approximately November 2016, MELGAR DIAZ was again deported from the United States to El Salvador.  From approximately November 2016 and continuing through at least May 2020, MELGAR DIAZ was in El Salvador.

5.     After his return to El Salvador in 2016, MELGAR DIAZ continued to be an active member of MS-13.  In approximately May 2017, he became the leader of the East Coast Program of MS-13 and, as set forth more fully below, MELGAR DIAZ was responsible for supervising the activities of multiple cliques in numerous states in the United States, including cliques operating in the Eastern District of Virginia.

2

Background of MS-13

6.     MS-13 was a violent, transnational criminal organization involved in a variety of criminal activities, including murder, aggravated assault, extortion, abduction, kidnapping, obstruction of justice, and drug trafficking in the Eastern District of Virginia and elsewhere.

7.     MS-13 members and associates were located throughout the United States, including in Virginia, Maryland, Ohio, Texas, New York, and California. MS-13 also had a large international presence in El Salvador, Guatemala, Honduras, and Mexico. MS-13 recruited members and associates predominantly from the Hispanic community.

8.     MS-13 originated in the 1980s in the United States among Central American immigrants in southern California. Numerous MS-13 members were deported from the United States back to El Salvador and other Central American countries in the 1990s. These members grew the gang in El Salvador, Honduras, and Guatemala, and expanded MS-13 across the United States, including to the Eastern District of Virginia. In El Salvador alone, MS-13 grew to include approximately 50,000 to 70,000 members. MS-13 also developed rules for members and a leadership hierarchy.

9.     MS-13 used violence to intimidate and control the local civilian population within the territory it controlled in El Salvador and as a means of attempting to influence government action and retaliating against government action it opposed in El Salvador. MS-13 engaged in extensive extortion of local businesses and individuals based on the threat of violence. This violence was often particularly gruesome in order to send messages to the local population on what would happen to those who do not submit to and pay MS-13. MS-13 especially targeted the public transportation network of El Salvador, frequently extorting bus drivers, owners, and passengers. MS-13 also specifically targeted law enforcement officers, government officials, and military

3

members, including carrying out attacks on such individuals that resulted in many serious injuries and deaths. MS-13 also used car bombs and other improvised explosive devices ("IEDs") against targets in El Salvador.

10.     MS-13 negotiated and made agreements with the government in El Salvador. For example, in approximately 2012, MS-13 entered into a truce agreement with the 18th Street gang, a rival of MS-13, and with the government of El Salvador in which MS-13 agreed to reduce violence in exchange for certain benefits from the government, including better prison conditions for MS-13 leadership.

11.     MS-13 also used violence to influence governmental action and retaliate against the government in El Salvador. For example, after the truce between the government, MS-13, and the 18th Street broke down because MS-13 continued to commit violent crime, the government revoked many of the benefits that had been provided to MS-13 leaders as part of the truce.   In response, and in an attempt to force the government to negotiate again, MS-13 retaliated by engaging in a campaign of violence in El Salvador against the civilian population, law enforcement, the military, and government officials that resulted in thousands of deaths.

12.     On August 24, 2015, the Supreme Court of El Salvador designated MS-13 as a terrorist organization under El Salvador's Special Laws Against Terrorism.

<u>Designation of MS-13 Under IEEPA</u>

13.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1702(a)(1), gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security,

4

foreign policy, or economy of the United States." Executive orders issued pursuant to IEEPA could impose restrictions against transactions involving property belonging to specific persons or entities.

14.     On July 24, 2011, the President issued Executive Order 13581, which declared a national emergency with respect to the activities of significant transnational criminal organizations. Executive Order 13581 was based on a presidential finding that "significant transnational criminal organizations constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Executive Order 13581 applied to specific significant transnational criminal organizations named in the annex to the order and to any person or entity designated by the Secretary of the Treasury as a significant transnational criminal organization. Among other things, Executive Order 13581 prohibited transactions by United States persons or involving United States property with designated significant transnational criminal organizations.

15.     Regulations implementing Executive Order 13581 were published at Title 31, Code of Federal Regulations, Part 590. The regulations prohibited transactions by U.S. persons or involving U.S. property with designated significant transnational criminal organizations, unless a license was obtained from the Office of Foreign Assets Control ("OFAC").

16.     On October 11, 2012, the Secretary of the Treasury designated MS-13 as a significant transnational criminal organization, pursuant to Executive Order 13581.

<u>Organization of MS-13</u>

17.     MS-13 was organized into groups known as "cliques" that held regular meetings to coordinate gang activities. Each clique was run by the senior leader, who was designated the "*Primera Palabra*," or "First Word," and the second-in-command, who was designated the

5

"*Segunda Palabra*" or "Second Word." The other members and associates of the clique took their orders from the First Word or Second Word. The leaders of the respective cliques attended larger general meetings to manage gang operations on a regional and international level.

18.     MS-13 members attended clique meetings and were required to pay dues. MS-13 members obtained money through illegal means, including, but not limited to, extortion and drug trafficking. The money was provided to clique leaders and used to finance clique activities, to provide support for clique members who were in jail, and to send funds to MS-13 leadership in El Salvador to support the gang there, including the purchase of weapons.

19.     MS-13 recruits were indoctrinated into MS-13 rules.   One prominent rule encouraged MS-13 members and associates to confront, fight, and kill rival gang members, known as *chavalas*.   Another prominent rule required MS-13 members and associates to identify individuals cooperating with law enforcement authorities.  When such individuals were identified, MS-13 members and associates were required to notify senior gang members, who typically ordered (*i.e.*, "green lighted") the killing of the individuals cooperating with law enforcement authorities.

20.     To promote their gang identity, MS-13 members and associates often, but not always, wore blue or white clothing (the colors of the El Salvadoran flag), as well as clothing displaying the number "13" or numbers that total 13, such as "76." MS-13 members and associates also often, but not always, had tattoos reading "Mara Salvatrucha," "MS," or "MS-13," and marked their territory with graffiti displaying those names and symbols associated with the gang.  One such symbol was the MS-13 hand sign, meant to resemble both an inverted "M" and the face of the devil, with outstretched fingers representing devil's horns.  More recently, some MS-13 members more discreetly and less publicly signified their membership by avoiding such clothing

6

and hiding such tattoos in order to avoid detection by law enforcement. MS-13 members referred to one another by their gang names or other nicknames, and may not have known fellow gang members except by these gang names. In order to protect the power, reputation, and territory of MS-13, members and associates were required to use violence, threats of violence, and intimidation. These acts of violence included murder and assault with deadly weapons, including firearms, machetes, and knives. MS-13 members and associates maintained and enhanced their status in the gang, and the overall reputation of the gang, by participating in such violent acts.

21.    MS-13 cliques often banded together for support under umbrella groups, called "Programs." Several MS-13 cliques located on the East Coast of the United States banded together under an MS-13 umbrella group called the "East Coast Program." Cliques in the East Coast Program included, but were not limited to:

a.    MELGAR DIAZ's clique, the Gangster Locos Salvatruchas, also known as GLS, located in Virginia, Maryland, the District of Columbia, North Carolina, and Texas;

b.    The Coronados Little Cycos Salvatruchas, also known as CLS, located in Virginia, Maryland, Texas, and New York;

c.    The Gangster Little Cycos Salvatruchas, also known as GLCS, located in Virginia and Maryland;

d.    The Everett Locos Salvatruchas, also known as ELS, located in Massachusetts and Maryland;

e.    The East Side Boston Locos Salvatruchas, also known as EBLS, located in Massachusetts;

f.    The Pulgarcitos Locos Salvatruchas, also known as PLS, located in North Carolina and Texas;

7

g.     The Cycos Locos Salvatruchas, also known as CLS, located in Massachusetts;

h.     The Virginia Locos Salvatruchas, also known as VLS, located in Virginia and Maryland;

i.     The Molinos Locos Salvatruchas, also known as MLS, located in Maryland and Texas;

j.     The Plainfield Locos Salvatruchas, also known as PLS, located in New Jersey;

k.     The Demonios Locos Salvatruchas, also known as DLS, located in New Jersey and North Carolina;

l.     The Santa Maria Little Salvis, also known as SMLS, located in California and North Carolina;

m.     The Viruleños Locos Salvatruchas, also known as VLS, located in Virginia;

n.     The Familia Criminales Locos Salvatruchas, also known as FCLS, located in Texas, New York, and North Carolina;

o.     The Uñiones Locos Salvatruchas, also known as ULS, located in Virginia, Maryland, and Ohio;

p.     The Charlotte Locos Salvatrucha, also known as CLS, located in North Carolina;

q.     The Delicias Locos Salvatruchas, also known as DLS, located in Virginia and Maryland;

r.     The Providencias Locos Salvatruchas, also known as PLS, located in Rhode Island;

8

s.      The Thompson Place Locos Salvatruchas, also known as TPLS, located in Tennessee;

t.      The Trece Locos Salvatruchas, also known as TLS, located in Massachusetts; and

u.      The Peajes Locos Salvatruchas, also known as PLS, located in Maryland and North Carolina.

22.     Cliques associating with each other in a large program were responsible for assisting one another with firearms, drug trafficking connections, territorial disputes with rival gangs, and providing safe havens for members who were wanted by law enforcement.

23.     Programs, such as the East Coast Program, were supervised and directed by Program leaders based in El Salvador, commonly referred to as *"Corredors."*

24.     Program *Corredors* were high-ranking MS-13 members, based in El Salvador, with the responsibility of overseeing and directing the activities of MS-13 cliques in the United States. A *Corredor's* responsibilities included speaking with the First Words of each clique on a regular basis, approving the initiation of new members (referred to within MS-13 as "being jumped in," such an initiation involves members of the clique beating the initiate while the First Word counts to thirteen), officiating disputes between cliques, and issuing corrective action against MS-13 members who violated MS-13 rules, to include beatings and death.

25.     Individuals holding the title of "Zone *Corredors*" often supervised multiple Program *Corredors*. Zone *Corredors* supervised the program activities occurring in large zones of El Salvador and were tasked with supervising multiple programs. The Zone *Corredors* reported directly to the national and international leadership of MS-13, referred to as *"La Ranfla."* As the highest ranking leaders of MS-13, *La Ranfla* disseminated directives regarding, *inter alia*, MS-13

9

rules, policies, organizational structure, methods of communication, finances, and criminal activities to Zone *Corredors* and *Corredors*, who were responsible for implementing those directives in the United States, including the Eastern District of Virginia, El Salvador and elsewhere.

26.     Program *Corredors* were also responsible for collecting dues from each clique in the Program. After receiving these funds in El Salvador, the Program *Corredors* then distributed the funds to MS-13 in El Salvador, including *La Ranfla*, to assist in purchasing weapons or drugs for resale.

The Racketeering Enterprise

27.     MS-13, including its leaders, members, and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. MS-13 was an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

Purposes of the Enterprise

28.     The purposes of the MS-13 enterprise included the following:

(a)     Preserving, expanding, and protecting the power, territory, and reputation of MS-13 through the use of violence, threats of violence, and intimidation;

(b)     Influencing the actions of governments in El Salvador and elsewhere to implement policies favorable to MS-13;

(c)     Supporting specific political parties in Salvadoran elections with the purpose of obtaining benefits in return when the party takes office;

(d)     Establishing control of territory and civilian populations that MS-13 could use and exploit to benefit the gang;

(e)     Promoting and enhancing MS-13 and the activities of its members and associates by committing crimes, including, but not limited to, murder;

(f)     Keeping victims, potential victims, community members, and law enforcement in fear of MS-13 and its members and associates through violence, threats of violence, and intimidation;

(g)     Confronting and retaliating against rival gangs through the use of violence, threats of violence, and intimidation;

(h)     Assaulting and murdering individuals believed to be cooperating with law enforcement authorities;

(i)     Hindering and obstructing efforts of law enforcement to identify, apprehend, and successfully prosecute offending MS-13 members; and

(j)     Providing financial support and information to MS-13 members, including those incarcerated in the United States and in El Salvador.

<u>Means and Methods of the Enterprise</u>

29.     Among the means and methods by which MS-13 members and associates conducted and participated in the conduct of the affairs of the enterprise were the following:

(a)     MS-13 members and associates used violence, threats of violence, and intimidation to preserve, protect, and expand the enterprise's territory and activities and to enhance its prestige, reputation, and position in the community;

(b)     MS-13 members and associates promoted a climate of fear through violence, threats of violence, and intimidation;

11

(c)     MS-13 members and associates used violence, threats of violence, and intimidation to discipline and punish members and associates who violate enterprise rules;

(d)     MS-13 members and associates used cellular phones, including contraband cellular phones illegally smuggled into jails and prisons, and encrypted application-based communication systems to discuss gang-related business and to obtain approval for the use of violence to further the purposes of MS-13;

(e)     MS-13 members and associates collected dues, often the proceeds of drug trafficking and extortions, to send to MS-13 members incarcerated in the United States and El Salvador and to MS-13 leadership in El Salvador, in an effort to provide financial support for the enterprise, including for the purchasing of weapons to use to commit acts of violence in El Salvador;

(f)     MS-13 members and associates financed the enterprise through a variety of activities, including trafficking in controlled substances, collecting dues from gang members, and extortion of legitimate and illegitimate businesses operating in the gang's territory, as well as through the commission of robberies;

(g)     MS-13 members and associates used non-gang members to send and receive funds such as dues payments from members and cliques in the United States to MS-13 in El Salvador in order to conceal the source and recipients of the funds;

(h)     MS-13 members and associates used, attempted to use, and conspired to use extortion;

(i)     MS-13 members and associates committed violent crimes in order to be promoted in the gang, which had, among others, the following positions in ascending order: *paro*, *observacion*, *chequeo*, and homeboy;

(j)    MS-13 members and associates used cellular phones to record the violent acts that they committed as a means of proving to gang leadership that they were worthy of promotion within the gang's ranks;

(k)    MS-13 members and associates distributed and agreed to distribute controlled substances on behalf of the gang;

(l)    MS-13 members and associates used violence to intimidate the local civilian population, to influence the civilian population to vote for political parties associated with MS-13, to influence the actions of the government of El Salvador, to retaliate against government actions, to attempt to force the government to negotiate, and to kill law enforcement officers in El Salvador; and

(m)    MS-13 members and associates operated subject to a hierarchy and rules that required authorizations be obtained from leadership in El Salvador for certain violent crimes in the United States, including murders.

<u>COUNT ONE</u>
(Conspiracy to Participate in a Racketeering Enterprise)

THE GRAND JURY FURTHER CHARGES THAT:

30.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

31.     Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," and other persons known and unknown to the Grand Jury, being persons employed by and associated with MS-13, which was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity consisting of:

    a.  multiple acts involving:

        i.  murder, in violation of Texas Penal Code, Sections 7.01, 7.02, 15.01, 15.02, 15.03, 19.02,and 19.03;

        ii.  murder, in violation of Virginia Code, Sections 18.2-22, 18.2-26, and 18.2-32; and

        iii.  murder, in violation of Maryland Code, Criminal Law Sections 2-201, 2-204, 2-205, 2-206, 1-201, and 1-202, and the Common Law of Maryland.

    b.  multiple offenses involving:

        i.  the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in controlled substances or listed chemicals, in violation of 21 U.S.C. §§ 841, 846, and 959.

14

    c. multiple acts indictable under:

        i. 18 U.S.C. § 1956 (relating to engaging in monetary transactions in property derived from specified unlawful activity);

        ii. 18 U.S.C. § 2339A (relating to providing material support to terrorists);

        iii. 18 U.S.C. § 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad);

        iv. 18 U.S.C. § 2332b (relating to acts of terrorism transcending national boundaries);

        v. 18 U.S.C. § 2339C (relating to financing terrorism); and

        vi. 21 U.S.C. § 960a (relating to narco-terrorism).

32. It was a further part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

Overt Acts

33. In furtherance of the conspiracy, and to effect the object thereof, the defendant, and others known and unknown to the Grand Jury, committed overt acts in the Eastern District of Virginia, El Salvador, and elsewhere, including, but not limited to, the following:

    a. In or about May 2017, MELGAR DIAZ became the *Corredor* of the MS-13 East Coast Program.

    b. As the *Corredor* of the East Coast Program, MELGAR DIAZ contacted the leaders of every MS-13 clique involved in the East Coast Program, including cliques which had a presence in the Eastern District of Virginia.

15

c.    As the *Corredor* of the East Coast Program, MELGAR DIAZ conducted a census of MS-13 members in the East Coast Program in the United States. Members were marked "clean," "dirty," or "absent."

d.    As the *Corredor* of the East Coast Program, MELGAR DIAZ, in El Salvador, supervised and directed the activities of numerous MS-13 cliques based in the United States, including without limitation the cliques described above in paragraph 21.

e.    As the *Corredor* of the East Coast Program, MELGAR DIAZ remained in close contact with MS-13 leaders in El Salvador, and MS-13 leaders in Mexico, who were working with the Gulf Cartel.

f.    As the *Corredor* of the East Coast Program, MELGAR DIAZ required all East Coast Program cliques based in the United States to send at least $75.00 a month to MELGAR DIAZ in El Salvador to support the East Coast Program and MS-13 operations in El Salvador.

g.    As the *Corredor* of the East Coast Program, MELGAR DIAZ received approximately $800.00 - $900.00, on average, a month from MS-13 cliques based in the United States. MELGAR DIAZ used this money to support MS-13 in El Salvador by buying weapons and drugs for MS-13 cliques and programs in El Salvador.

h.    As the *Corredor* of the East Coast Program, MELGAR DIAZ required cliques to transfer payments to the East Coast Program on the 13th day of every month to represent the "13" in MS-13.

i.    As the *Corredor* of the East Coast Program, MELGAR DIAZ created a network of non-gang member relatives and associates in El Salvador, who agreed to receive

wire transfers in El Salvador on his behalf, sent from MS-13 cliques based in the United States.

j.      As the *Corredor* of the East Coast Program, MELGAR DIAZ sent these funds to *La Ranfla* for distribution among the programs.

k.      As the *Corredor* of the East Coast Program, MELGAR DIAZ sent East Coast Program funds to one or more MS-13 leaders in El Salvador.

l.      As the *Corredor* of the East Coast Program, MELGAR DIAZ reported regularly to one or more MS-13 Zone *Corredors* in MELGAR DIAZ's region of El Salvador.

m.      As the *Corredor* of the East Coast Program, MELGAR DIAZ distributed the MS-13 rules to the East Coast Program clique leaders based in the United States.

n.      As the *Corredor* of the East Coast Program, MELGAR DIAZ imposed rules on the East Coast Program cliques, including without limitation, that the cliques should recruit new members, kill rival gang members, and sell drugs.

o.      As the *Corredor* of the East Coast Program, MELGAR DIAZ demanded that half the proceeds of all drug sales made by East Coast Program cliques in the United States be sent to MS-13 in El Salvador.

p.      As the *Corredor* of the East Coast Program, MELGAR DIAZ created group chats using an encrypted social media application with United States-based MS-13 clique leaders.  Through this group chat, MELGAR DIAZ communicated with United States-based MS-13 clique leaders, including those in the Eastern District of Virginia, and received requests for permission to extort businesses, impose punishments on MS-13

17

members who violated gang rules, and to authorize the killing of individuals, known as "green lights."

q.      As the *Corredor* of the East Coast Program, MELGAR DIAZ passed these "kill" and "extortion" requests to higher MS-13 leadership in El Salvador for approval and then re-distributed them to the cliques depending on the leadership's answer.

r.      While MELGAR DIAZ served as *Corredor* of the East Coast Program, MS-13's leadership in El Salvador ordered a blanket "green light," or approval, known as an "open valve," to kill police officers, military personnel, and rival gang members in El Salvador.

s.      Beginning in or about May 2017, MS-13 members from the Delicias clique generated significant profits by selling cocaine at three restaurants located in Oxon Hill, Maryland and one location in Woodbridge, Virginia, which is in the Eastern District of Virginia. MELGAR DIAZ ordered the Delicias clique leader to begin sending $500.00 every fifteen days to MELGAR DIAZ and the East Coast Program.

t.      On or about May 15, 2017, approximately $200.00 was transferred from the Eastern District of Virginia to an associate of MELGAR DIAZ in El Salvador.

u.      On or about July 19, 2017, approximately $50.00 was transferred from the Eastern District of Virginia to an associate of MELGAR DIAZ in El Salvador.

v.      In or about and between October 2017 and December 2017, MELGAR DIAZ discussed with an identified member of MS-13 a plan to have three MS-13 members travel from Mexico to the United States to carry out an attack at a location in Virginia.

w.      In or around late 2017 or early 2018, an identified MS-13 member in Dallas, Texas relayed a message to MELGAR DIAZ in El Salvador asking him to investigate and

18

order a green light on an MS-13 member in Charlotte, North Carolina for possibly cooperating with law enforcement.

x.     In or around November 2017, an identified MS-13 member in Dallas, Texas passed another request to MELGAR DIAZ, wherein he requested permission to murder an MS-13 member in Dallas and the member's girlfriend. MELGAR DIAZ in turn passed this request for permission to kill to his Zone *Corredor* for approval.

y.     In or around November 2017, MELGAR DIAZ passed this kill approval back to the MS-13 members based in Dallas, Texas, who in turn searched for the two targets in an effort to kill them on behalf of MS-13 for violating MS-13 rules.

z.     In or around December 2017, MELGAR DIAZ called an MS-13 member in the United States to tell him that he, MELGAR DIAZ, was busy "going to the mountain to kill two people," and was not able to spend time discussing other gang business.

aa.     In or around January 2018, MELGAR DIAZ and an MS-13 member based in Mexico ordered members of the MS-13 Pulgarcitos clique to recover money owed to MS-13 in Mexico. MELGAR DIAZ and the Mexico MS-13 member ordered the U.S.-based MS-13 members to travel to Oklahoma, Texas, and Louisiana to retrieve, through violence or the threat of violence, moneys owed to MS-13.

bb.     In or around January 2018, MELGAR DIAZ ordered members of the Pulgarcitos clique of MS-13 to locate a Mexican family in Oklahoma that owed $145,000.00 to an MS-13 member embedded with the Gulf Cartel in Mexico. MELGAR DIAZ ordered members of the Pulgarcitos clique to kidnap the family, hold them hostage, and extort the $145,000.00, on behalf of MS-13.

19

cc.     On or about January 20, 2018, MELGAR DIAZ contacted an MS-13 member in Maryland and instructed him to deliver a portion of East Coast Program funds to a relative in Silver Spring, Maryland and send the remaining balance to El Salvador.

dd.     On or about January 20, 2018, MELGAR DIAZ called an MS-13 member in the Eastern District of Virginia to discuss MS-13 activities in Virginia.

ee.     On or about January 21, 2018, MELGAR DIAZ called an MS-13 member in Virginia to discuss financial transactions and the affairs of MS-13 in Virginia and Maryland.

ff.     In or around January 2018, MELGAR DIAZ sent two firearms to an identified MS-13 member in El Salvador.

gg.     In or around February 2018, MELGAR DIAZ and an MS-13 member based in Mexico, engaged in an arms and drug smuggling operation wherein the MS-13 member in Mexico shipped firearms and narcotics south through Mexico and Guatemala before arriving at the northern El Salvador border.

hh.     In or around February 2018, MELGAR DIAZ repeatedly sent MS-13 members in Hachadura, El Salvador to the Guatemalan border to receive large shipments of controlled substances and firearms on behalf of MS-13.

ii.     In or around February 2018, MELGAR DIAZ repeatedly sent MS-13 members and associates to Hachadura, El Salvador to retrieve drugs and firearms after they were smuggled into El Salvador. MELGAR DIAZ then caused these items to be sold and transferred to other MS-13 cliques in El Salvador.

jj.  On or about February 9, 2018, MELGAR DIAZ arranged for MS-13 members to transfer East Coast Program funds to an MS-13 member in Mexico who was facilitating the East Coast Program's drug trafficking supply chain.

kk.  On or about February 10, 2018, approximately $1,500.00 was transferred from the Eastern District of Virginia to a known member of the East Coast Program, in Charlotte, North Carolina.

ll.  In or around February 2018, MS-13 leadership in El Salvador distributed a message to clique leaders in the United States, in part through MELGAR DIAZ, and elsewhere ordering that "the valve had been opened" for the recruitment of new members to MS-13, which would include requesting that the new recruits commit acts of violence on behalf of MS-13.

mm.  On or about February 16, 2018, MELGAR DIAZ called an MS-13 member in North Carolina to discuss whether his clique, the Pinos Locos Salvatruchas, would be joining the East Coast Program. MELGAR DIAZ and this MS-13 member discussed MS-13 business and the three MS-13 programs functioning in the United States; the L.A. Program, the New York Program, and the East Coast Program.

nn.  On or about February 25, 2018, approximately $1,800.00 was transferred from the Eastern District of Virginia to a known member of the East Coast Program, in Charlotte, North Carolina.

oo.  In or around March 2018, MELGAR DIAZ was instructed by an MS-13 Zone *Corredor* in El Salvador to direct ECP members in El Salvador to vote for an identified political party in municipal elections in El Salvador.

pp.     In or around March 2018, members of the Uñiones clique of MS-13, which had a presence in the Eastern District of Virginia, specifically in Reston, Virginia, sent MELGAR DIAZ several photos of garbage bags, supposedly containing the body of an 18th Street member who had been killed and dismembered by MS-13 cliques in Virginia.

qq.     On or about March 2, 2018, MELGAR DIAZ called an MS-13 member in Tennessee to discuss MS-13 activities involving the TPLS clique of MS-13 in Tennessee.

rr.     On or about March 2, 2018, MELGAR DIAZ called an MS-13 member in Massachusetts to discuss MS-13 activities in Massachusetts involving the East Boston Locos clique of MS-13.

ss.     On or about March 5, 2018, MELGAR DIAZ called an MS-13 member in Rhode Island to discuss MS-13 activities in Rhode Island involving the Providencias clique of MS-13.

tt.     On or about March 5, 2018, MELGAR DIAZ called an MS-13 member located in the Eastern District of Virginia to discuss MS-13 activities, including drug trafficking and the distribution of profits relating to MS-13 drug trafficking in Virginia.

uu.     On or about March 5, 2018, MELGAR DIAZ called an MS-13 member located in Rhode Island to discuss MS-13 activities, including the Providencias clique of MS-13, the 503 Program of MS-13, and related "green lights."

vv.     On or about March 9, 2018, MELGAR DIAZ called an MS-13 member in Virginia to discuss MS-13 activities, including drug trafficking activities.

ww.     On or about March 20, 2018, MELGAR DIAZ called an MS-13 member in the United States to discuss a murder that the Pinos clique of MS-13 had committed in Maryland. The two discussed the approvals and the circumstances of the murder.

xx.     On or about March 20, 2018, MELGAR DIAZ and a U.S.-based MS-13 member discussed an MS-13 murder occurring in Fairfax County, Virginia, in the Eastern District of Virginia, the week prior on March 15, 2018.   This individual informed MELGAR DIAZ that a Francis clique member, an Everett clique member, a Pinos clique member, and an individual from an unknown MS-13 clique, were involved in this Virginia murder.

yy.     On or about March 27, 2018, MELGAR DIAZ called members of the Dalmacia clique of MS-13, which had a presence in the Eastern District of Virginia. MELGAR DIAZ informed them that he was the *Corredor* of the East Coast Program. MELGAR DIAZ explained to these members that he also had the United States *Corredor* of the GLS clique of MS-13 on the line, who was based in Virginia.   MELGAR DIAZ informed the Dalmacia member that MS-13 was having a problem with one of the younger members of his clique, and that MELGAR DIAZ was going to authorize a beating of this younger MS-13 associate.   MELGAR DIAZ instructed the United States *Corredor* of the GLS clique of MS-13 to give this member a "light beating," and "kicking," but "not to kill him," and "not to touch his face," for violating the rules of MS-13.   MELGAR DIAZ further instructed them to tell this member that the leader, MELGAR DIAZ, authorized his beating.   MELGAR DIAZ then instructed specific members of the GLS clique in Virginia to issue the beating, and they discussed traveling to Richmond, Virginia, in the Eastern District of Virginia, to impose the punishment.

zz.     On or about March 27, 2018, MELGAR DIAZ and the United States *Corredor* of the GLS clique of MS-13 then proceeded to discuss drug trafficking activity in Virginia and an arrangement for MELGAR DIAZ to invest East Coast Program funds

with the Virginia MS-13 members. MELGAR DIAZ agreed to send $500.00 to this member to invest in a drug purchase for resale.

aaa.    On or about March 30, 2018, MELGAR DIAZ contacted the United States *Corredor* of GLS and asked about the status of a drug purchase, financially supported by MELGAR DIAZ. The GLS member informed MELGAR DIAZ that he was in Virginia Beach, which is in the Eastern District of Virginia, and waiting to hear back from an MS-13 member from the Viruleños clique of MS-13.

bbb.    On or about April 1, 2018, approximately $700.00 was transferred from the Eastern District of Virginia to a known member of the East Coast Program, in Dallas, Texas.

ccc.    On or about April 6, 2018, MELGAR DIAZ spoke with an El Salvador-based MS-13 member. The two discussed how to get in touch with MS-13 members in Nashville regarding a drug trafficking arrangement. The MS-13 member in El Salvador told MELGAR DIAZ that the MS-13 clique in Nashville was the TPLS clique, and provided a Tennessee-based telephone number for future contacts.

ddd.    On or about April 20, 2018, MELGAR DIAZ spoke with an MS-13 member from the GLS clique in the United States to check in on the status of his MS-13 clique. The clique member told MELGAR DIAZ which MS-13 members remained from the GLS clique in his area, and MELGAR DIAZ responded that he "made" those members while MELGAR DIAZ was in this area. MELGAR DIAZ asked him if he was going to become active with MS-13 and told him that he needed to get active or there would be punishment.

eee.    On or about April 20, 2018, MELGAR DIAZ and other MS-13 leadership members in El Salvador discussed what do to do with the MS-13 member referenced in

24

paragraph yy if he did not become more active with MS-13. They agreed that he would be required to pay his MS-13 dues regardless. MELGAR DIAZ told the other leadership members that if he was not going to follow the rules, they would "not leave him in peace" and would "cause him problems."

fff.     On or about April 20, 2018, MELGAR DIAZ informed the MS-13 member referenced in paragraph yy that he was still required to pay a monthly $100.00 dues payment until things calmed down in his area. He then provided the El Salvadoran leaders with his telephone number in the United States with a "301" area code for future contact.

ggg.     In or around May 2018, MELGAR DIAZ received a request on behalf of the Familia Criminales clique of MS-13 based in Houston, Texas and El Salvador. The clique requested permission to murder a minor female who the Familia Criminales clique believed was cooperating with the police. As the East Coast Program *Corredor*, MELGAR DIAZ sent this request to a member of the Via Satelite clique, who was the Zone *Corredor* in El Salvador, for approval.

hhh.     In or around May 2018, the Zone *Corredor* in El Salvador approved the murder and sent the approval to MELGAR DIAZ.

iii.     In or around May 2018, MELGAR DIAZ transmitted the murder approval to MS-13 members in Houston, who then murdered the minor female in or around May 2018.

jjj.     Following the murder of the minor female, in or around May 2018, an MS-13 member in Houston, Texas, sent a photo of the deceased victim to MELGAR DIAZ as confirmation that the murder occurred. MELGAR DIAZ in turn passed the photo to the Zone *Corredor* in MELGAR DIAZ's region of El Salvador.

kkk.   On or about May 22, 2018, MELGAR DIAZ's second-in-charge, based in El Salvador, called the United States leader for the GLS clique of MS-13 and instructed him to send $200.00 to MELGAR DIAZ and $100.00 directly to him.

lll.   In or around 2018, an MS-13 member, based in Houston, Texas, murdered a suspected 18th Street gang member and sent a photo of the deceased victim to MELGAR DIAZ in El Salvador. The MS-13 member committed this murder in order to be promoted to the rank of homeboy in MS-13.

mmm. In or around 2018, MELGAR DIAZ attempted to assist MS-13 leadership in locating an MS-13 associate in the United States who was suspected of stealing $1,800.00 from the Virginia Locos clique, which had a presence in the Eastern District of Virginia. MELGAR DIAZ's purpose in looking for this MS-13 member was to issue corrective actions for stealing these funds.

nnn.   In or around June 2018, MELGAR DIAZ engaged in a series of text message exchanges with the MS-13 TPLS clique leader in Nashville, Tennessee. MELGAR DIAZ introduced himself as the *Corredor* of the East Coast Program and provided the contact information for several MS-13 clique leaders located in Massachusetts, Maryland, Virginia, and North Carolina.

ooo.   From in or around June 2018 to in or around August 2018, MELGAR DIAZ and members of the TPLS clique of MS-13 engaged in a drug trafficking conspiracy where MELGAR DIAZ would send East Coast Program funds to this clique in Nashville, Tennessee to assist in funding large cocaine purchases on behalf of the gang.

ppp.     In or around June 2018, MELGAR DIAZ sent at least $1,500.00 in MS-13 East Coast Program funds to MS-13 members in Nashville, Tennessee to assist them in purchasing cocaine for resale.

qqq.     In or around June 2018, MELGAR DIAZ, on behalf of the East Coast Program of MS-13, received drug trafficking proceeds sent from the United States to El Salvador, transferred as part of a drug trafficking agreement between MELGAR DIAZ and the TPLS clique of MS-13 based in Nashville, Tennessee.

rrr.     In or around June 2018, MELGAR DIAZ caused an associate in El Salvador to receive drug trafficking proceeds in the associate's name from MS-13 members in the United States. After receiving these transfers, MELGAR DIAZ retrieved the funds from the associate.

sss.     In or around June 2018, MELGAR DIAZ informed MS-13 members that he observed an MS-13 member speaking with law enforcement in El Salvador. MELGAR DIAZ stated that the MS-13 member and his family members would be killed for this action, but out of respect, they would be given 30 days to flee El Salvador.

ttt.     On or about July 16, 2018, MELGAR DIAZ called the United States leader of the GLS clique and inquired about a fight between MS-13 members in the United States. MELGAR DIAZ asked about the status of the Sitios and Molinos cliques of MS-13. The GLS clique leader then informed MELGAR DIAZ that they had collected his money and were just waiting for some names to use to send it to El Salvador.

uuu.     During 2018, MELGAR DIAZ, from El Salvador, introduced MS-13 members in North Carolina to MS-13 members in Nashville, Tennessee for the purpose of

assisting the North Carolina members in obtaining a source of drug supply for cocaine sales in North Carolina.

vvv.    In or around August 2018, following the arrest of several members of the TPLS clique in Nashville, Tennessee, an MS-13 member in the United States sent MELGAR DIAZ information about another MS-13 member believed to be cooperating with law enforcement. MELGAR DIAZ sent a photograph of this member to all MS-13 programs in El Salvador to determine whether the person had family in El Salvador and whether those family members should receive a "green light" or kill order.

www.   In or around September 2018, a leader of the Charlotte Locos clique of MS-13 based in North Carolina, sent money to MELGAR DIAZ, and the East Coast Program leadership in El Salvador.

xxx.    In or around October 2018, MELGAR DIAZ ordered the members of the Pulgarcitos clique of MS-13 to pay their past MS-13 gang dues or face discipline.

yyy.    On or about September 18, 2018, MELGAR DIAZ spoke with an MS-13 member based in New Jersey to inquire about the status of MS-13 members in Plainfield, New Jersey.

zzz.    On or about September 18, 2018, MELGAR DIAZ spoke with an MS-13 member based in Plainfield, New Jersey and requested a dues payment from this member in support of the East Coast Program.

aaaa.   On or about October 22, 2018, MELGAR DIAZ spoke with an MS-13 member in New Jersey to discuss gang finances. MELGAR DIAZ requested that this MS-13 member in New Jersey begin selling drugs for profit. MELGAR DIAZ then informed

28

the MS-13 member that MELGAR DIAZ had MS-13 members in Maryland and Tennessee, who were making $2,000.00 per ounce of cocaine sold.

bbbb.  In or around November 2018, MELGAR DIAZ in El Salvador, received approximately 100 kilograms of marijuana from an MS-13 member in Mexico. MELGAR DIAZ sent MS-13 members to the Guatemalan border to receive the marijuana and they sold the marijuana by the kilogram in El Salvador.

### Special Sentencing Factors Regarding Count One

34.    As part of his agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the defendant ARMANDO ELIU MELGAR DIAZ and others known and unknown to the Grand Jury, agreed that multiple acts of murder would be committed, in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code § 18.2-32, to wit, the willful, deliberate, and premeditated murder of a human being.

35.    As part of his agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the defendant ARMANDO ELIU MELGAR DIAZ and others known and unknown to the Grand Jury, agreed that multiple acts of murder would be committed in violation of Texas Penal Code Section Title 5, Chapter 19, Sections 19.02, 19.03(a)(9), to wit, intentionally and knowingly causing the death of an individual 10 years of age or older but younger than 15 years of age.

36.    As part of his agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the defendant ARMANDO ELIU MELGAR DIAZ and others known and unknown to the Grand Jury, knowingly and intentionally conspired, confederated and agreed to provide material support and resources, and to conceal and

29

disguise the nature, location, source, and ownership of material support and resources, including, but not limited to, personnel, including himself, currency and monetary instruments, and services, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Section 956; Title 18, United States Code, Section 2332b; Title 18, United States Code, Section 2339C; and Title 21, United States Code, Section 960a, and death of a person resulted, in violation of Title 18, United States Code, Section 2339A.

37.     As part of his agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the defendant ARMANDO ELIU MELGAR DIAZ and others known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, confederated, and agreed, within the jurisdiction of the United States, to commit at any place outside the United States an act that would constitute the offense of murder if committed in the special maritime and territorial jurisdiction of the United States, and at least one of the conspirators committed an act within the jurisdiction of the United States to effect any object of the conspiracy, in violation of Title 18, United States Code, Sections 956(a)(1) and 956(a)(2)(A).

38.     As part of his agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, and involving conduct transcending national boundaries, the defendant ARMANDO ELIU MELGAR DIAZ and others known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, confederated, and agreed, to kill any person within the United States in violation of the laws of any State, and one or more facilities of interstate and foreign commerce were used in furtherance

30

of the offense, and the death a person resulted, in violation of Title 18, United States Code, Sections 2332b(a)(1)(A), 2332b(a)(2), 2332b(c)(1)(A) and 2332b(c)(1)(F).

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO

(Conspiracy to Provide and Conceal Material Support and Resources to Terrorists)

THE GRAND JURY FURTHER CHARGES THAT:

39.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

40.     Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to provide material support and resources, and to conceal and disguise the nature, location, source, and ownership of material support and resources, including, but not limited to, personnel, including himself, currency and monetary instruments, and services, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill or maim persons outside the United States); Title 18, United States Code, Section 2332b (acts of terrorism transcending national boundaries); Title 18, United States Code, Section 2339C(a) (financing terrorism); and Title 21, United States Code, Section 960a (narco-terrorism), and the death of a person resulted.

All in violation of Title 18, United States Code, Section 2339A(a).

## COUNT THREE
(Conspiracy to Kill or Maim Persons Outside the United States)

THE GRAND JURY FURTHER CHARGES THAT:

41.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

42.     Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, within the jurisdiction of the United States, to commit at any place outside the United States an act that would constitute the offense of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, and at least one of the conspirators committed an act within the jurisdiction of the United States to effect any object of the conspiracy.

### Overt Acts

43.     In furtherance of the conspiracy and to effect the objects thereof, the defendant or a co-conspirator committed overt acts within the jurisdiction of the United States, including in the Eastern District of Virginia and elsewhere, including, but not limited to, the overt acts described in paragraphs 33(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (n), (o), (r), (s), (t), (u), (z), (aa), (bb), (cc), (dd), (ee), (ff), (gg), (hh), (ii), (jj), (kk), (ll), (nn), (tt), (zz), (aaa), (bbb), (fff), (kkk), (mmm), (ooo), (ppp), (qqq), (rrr), (ttt), (vvv), (www), (xxx), (zzz), and (aaaa) of Count One of this indictment are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 956(a)(1).

## COUNT FOUR
(Conspiracy to Commit Acts of Terrorism Transcending National Boundaries)

THE GRAND JURY FURTHER CHARGES THAT:

44.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

45.     Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, and involving conduct transcending national boundaries, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to kill, kidnap, maim, commit assaults resulting in serious bodily injury, and assault with a dangerous weapon any person within the United States in violation of the laws of any State, and one or more facilities of interstate and foreign commerce were used in furtherance of the offense, and the death of a person resulted.

### Overt Acts

46.     In furtherance of the conspiracy and to effect the objects thereof, the defendant committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the overt acts described in paragraphs 33(a), (b), (c), (d), (e), (l), (m), (n), (p), (q), (r), (v), (w), (x), (y), (aa), (bb), (pp), (uu), (ww), (xx), (yy), (ddd), (eee), (ggg), (hhh), (iii), (jjj), (lll), (mmm), (sss), (vvv), and (xxx) of Count One of this indictment are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Sections 2332b(a)(1)(A), 2332b(a)(2), and 2332(b)(c).

<u>COUNT FIVE</u>
(Conspiracy to Finance Terrorism)

THE GRAND JURY FURTHER CHARGES THAT:

47.    The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

48.    Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and intentionally combine, conspire, confederate and agree with others known and unknown to the Grand Jury to unlawfully and willfully provide and collect funds, by any means, directly and indirectly, with the intention that such funds be used, and with the knowledge that such funds were to be used, in full or in part, in order to carry out any act intended to cause death and serious bodily injury to a civilian, and to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of such act, by its nature and context, was to intimidate a population, and to compel a government or an international organization to do and to abstain from doing any act.

All in violation of Title 18, United States Code, Section 2339C(a)(1)(B) and (a)(2).

COUNT SIX
(Narco-Terrorism Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

49.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

50.     Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to engage in conduct that would be punishable under Title 21, United States Code, Section 841(a), if committed within the jurisdiction of the United States, that is to knowingly and intentionally distribute and possess with intent to distribute marijuana, cocaine, and other controlled substances, knowing and intending to provide, directly and indirectly, anything of pecuniary value to any person and organization, to wit: MS-13, that has engaged and engages in terrorist activity as defined in Title 8, United States Code, Section 1182(a)(3)(B).

All in violation of Title 21, United States Code, Section 960a(a).

36

COUNT SEVEN
(Conspiracy to Violate IEEPA)

THE GRAND JURY FURTHER CHARGES THAT:

51.    The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

52.    Beginning in or about November 2016, and continuing through in or about November 2018, both dates being approximate and inclusive, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to send monetary funds from U.S. persons and from the United States to MS-13, which had been specially designated a significant transnational criminal organization, in violation of the prohibitions against transactions with MS-13 imposed by the United States, without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of Treasury.

All in violation of Title 50, United States Code, Section 1705(a), and Title 31, Code of Federal Regulations, Part 590.201.

## COUNT EIGHT
### (Conspiracy to Distribute Controlled Substances)

THE GRAND JURY FURTHER CHARGES THAT:

53.     The GENERAL ALLEGATIONS of this indictment are realleged and incorporated by reference as though fully set forth herein.

54.     Beginning in and around November 2016, and continuing thereafter up to and including November 2018, to the Grand Jury, in the Eastern District of Virginia, El Salvador, and elsewhere, the defendant ARMANDO ELIU MELGAR DIAZ, also known as "Blue," also known as "Clipper," did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and 50 kilograms or more of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

UNITED STATES v. ARMANDO ELIU MELGAR DIAZ, aka "Blue," aka "Clipper"

A TRUE BILL.

_____

FOREPERSON

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY
EASTERN DISTRICT OF VIRGINIA

By: _____

Kevin L. Rosenberg
Special Assistant United States Attorney

_____

Matthew W. Shepherd
Special Assistant United States Attorney

_____

Nicholas J. Patterson
Assistant United States Attorney

39